[Civ. No. 37475. First Dist., Div. Two. July 15, 1976.]

PACIFIC GAS AND ELECTRIC COMPANY,
Plaintiff and Respondent, v.
CITY OF BERKELEY, Defendants and Appellants.

124

---

COUNSEL

Donald P. McCullum, City Attorney, Michael Lawson, Chief Deputy City Attorney, Lois L. Johnson, Deputy City Attorney, Susan Watkins, Assistant City Attorney and Charles O. Triebel, Jr., for Defendants and Appellants.

Malcolm A. MacKillop, Richard A. Clarke, Robert L. Harris, James A. Kaylor, Crosby, Heafey, Roach & May, Edwin A. Heafey, Jr., Peter W. Davis and Timothy J. Murphy for Plaintiff and Respondent.

## OPINION

**ROUSE, J.**—This action involves a constitutional attack by plaintiff, Pacific Gas and Electric Company (hereinafter "PG&E") upon section 605 of the Berkeley Election Reform Act of 1974. That section prohibits any "proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, or labor union" from making a contribution to "any candidate or committee." Elsewhere in the act, the word "committee" is defined as "any person or combination of persons[1] that directly or indirectly receives contributions or makes expenditures or contributions for the purpose of influencing or attempting to influence the action of voters for or against the nomination or election of one or more candidates, or the passage or defeat of any measure,[2] including any committee or subcommittee of a political party."

In its petition for declaratory and injunctive relief against the City of Berkeley,[3] PG&E alleged that in August 1974, the Berkeley City Council had placed on the ballot for submission to the voters at the November 5, 1974, election an "Acquisition Ordinance" which directed the city to acquire, by condemnation if necessary, PG&E's facilities within the city, in order that the city could establish a municipally owned and operated electric distribution system. It was further alleged in its petition that, as a result of its many years as the owner and operator of Berkeley's electric system, PG&E possessed much information on the subjects of utility valuation, utility rates, utility operations, taxes and other matters covered in the proposed ordinance; that PG&E was desirous of presenting this information to the electorate and to its employees, shareholders and customers in Berkeley; that defendants contended that PG&E was prohibited from doing so by section 605 of the Berkeley Election Reform

[1]"Persons" are defined in the act as "an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, committee, and any other organization or group of persons acting in concert."

[2]"Measure" is defined as any "ordinance or other proposition submitted to a popular vote at an election, whether by initiative . . . or otherwise . . . ."

[3]Also named as defendants were the Berkeley City Council, the individual members of said body and the Berkeley Fair Campaign Practices Commission.

Act of 1974. PG&E alleged in its petition that threatened enforcement of section 605 deprived it of its rights to freedom of speech, due process and equal protection.

PG&E prevailed in the trial court, which held that section 605 deprived it of freedom of speech and equal protection of the laws. Judgment was entered permanently enjoining the defendants from enforcing or attempting to enforce those restrictions of the Berkeley Election Reform Act of 1974 relating to expenditures or contributions in support of or in opposition to ballot measures. ██ Defendants filed a notice of appeal from that judgment.[4]

Subsequent to the filing of the briefs on appeal, two decisions have been rendered which settle one of the major issues argued by the parties. In the first of the two decisions, *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612], the United States Supreme Court held that a provision in the Federal Election Campaign Act of 1971 which placed a monetary limit on the amount which any individual or group could expend in voicing their views for or against a clearly identified political candidate was violative of the First Amendment guarantee of freedom of speech.

In the second decision, *Citizens for Jobs and Energy* v. *Fair Political Practices Com.* (1976) 16 Cal.3d 671 [129 Cal.Rptr. 106, 547 P.2d 1386], the California Supreme Court held that the reasoning of the *Buckley* case was equally applicable to a provision in the California Political Reform Act of 1974 (Gov. Code, tit. 9, § 81000 et seq.) which limited the amount which could be spent by the supporters and opponents of a statewide ballot measure. The court stated, "It is apparent that the *Buckley* decision is dispositive of the proceeding at bar, and the commission so concedes. While *Buckley* invalidated limitations on spending to influence the vote on candidates for office, rather than, as here, an initiative measure, the challenged federal and California provisions are similar in material respects and the court's reasoning is equally applicable to both. Indeed, the court foreshadowed our conclusion herein when it explained that 'Advocacy of the election or defeat of

[4]Defendants had also filed a notice of appeal from the trial court's earlier order granting PG&E a preliminary injunction. Since that order was a provisional remedy which ceased to have any operational effect once the permanent injunction was granted, the appeal therefrom must be dismissed. (*Peoples Ditch Co.* v. *Foothill Irr. Dist.* (1930) 103 Cal.App. 321, 325-326 [284 P. 514]; 6 Witkin, Cal. Procedure (2d ed. 1971) pt. I, § 77, p. 4089.)

candidates for federal office is *no less entitled* to protection under the First Amendment than the discussion of political policy generally or *advocacy of the passage or defeat of legislation.*' [Citation.]" (P. 675.)

The sole distinction between these two decisions and the instant case is that the parties in *Buckley* and in *Citizens for Jobs* consisted of individuals and political groups, whereas the plaintiff herein is a company organized for profit-making purposes. ██ Thus, the question before us is whether this distinction compels a different result premised upon the conclusion that corporations[5] or other companies engaged in money-making activities do not possess First Amendment rights. We reject such conclusion.

The *Buckley* case itself contains dicta which strongly suggests that private companies organized for profit and gain were intended to fall within the purview of the court's decision. There, the court held that the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed " 'to secure "the widest possible dissemination of information from diverse and antagonistic sources," ' and ' "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." ' [Citations.] The First Amendment's protection against governmental abridgement of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." (P. 49 [46 L.Ed.2d p. 705, 96 S.Ct. p. 649].) In support of this latter proposition, the court cited *Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523], where the court held that serious constitutional questions would arise if it were to hold that certain railroad companies were prohibited under the Sherman Act from engaging in a publicity campaign allegedly designed to injure the trucking industry, their competitor.

We need not rest our decision upon the *Buckley* case alone. In *Labor Board* v. *Virginia Power Co.* (1941) 314 U.S. 469, 477 [86 L.Ed. 348, 354,

---

[5]It is clear that corporate structure does not, in itself, furnish any basis for a denial of First Amendment rights. The prevailing parties in the *Buckley* case included political groups which were incorporated, such as the New York Civil Liberties Union, Inc. and Human Events, Inc. (*Buckley* v. *Valeo, supra,* at p. 8 [46 L.Ed.2d at p. 681, 96 S.Ct. at p. 629].) Further, in *NAACP* v. *Button* (1963) 371 U.S. 415, 428 [9 L.Ed.2d 405, 415, 83 S.Ct. 328], the Supreme Court held that the fact that the NAACP was a corporation posed no impediment to the assertion of its First Amendment rights.

62 S.Ct. 344], the court recognized the First Amendment rights of the Virginia Electric and Power Company to express its views with respect to joining or not joining unions. This holding was reaffirmed in *Thomas* v. *Collins* (1945) 323 U.S. 516, 537 [89 L.Ed. 430, 444, 65 S.Ct. 315].

In the subsequent case of *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501-502 [96 L.Ed. 1098, 1105-1106, 72 S.Ct. 777], it was argued that motion pictures were not protected by the First Amendment because their production, distribution and exhibition was a large scale business conducted for private profit. The court rejected this argument.

One other well reasoned decision dealing with the First Amendment rights of corporations organized and operated for profit deserves discussion. In *Schwartz* v. *Romnes* (2d Cir. 1974) 495 F.2d 844, which was cited by the trial court in its memorandum of decision, the New York Telephone Company had expended $50,000 for the purpose of publicizing its views concerning a proposed state public transportation bond issue to be submitted to the voters for a referendum vote. It was contended that such expenditure violated a New York statute which prohibited corporate payments for "any political purpose whatever." (P. 846, fn. 1.) The court rejected this argument, construed the statute in a narrow manner and held that it prohibited corporate contributions of a partisan nature in aid of a political party or candidate, but that it did not prohibit corporate contributions in support of a nonpartisan referendum. In so holding, the court pointed out that, if it were to construe the statute more broadly, the First Amendment rights of corporations would be abridged. The court stated, "[I]t is incumbent upon us to construe § 460, to the extent possible, in a manner that will not transgress constitutional rights, [citations], including those of corporate contributors which, like individuals, are guaranteed freedom of speech and petition. [Citations.] ... [T]he plaintiff's broad construction of § 460 would proscribe corporate contributions or expenditures for the purpose of communicating its views to the public with respect to an important issue to be decided by the voters and furnishing information that might be of assistance in arriving at that decision. 'Since corporations must usually expend moneys to communicate their views,' [citation], the effect of the district court's interpretation would be to inhibit such expression.

"Whatever the justification for prohibiting contributions that are prone to create political debts, it largely evaporates when the object of prohibition is not contributions to a candidate or party, but contributions

to a public referendum. The spectre of a political debt created by a contribution to a referendum campaign is too distant to warrant this further encroachment on First Amendment rights." (Pp. 852-853.)

■ It is apparent that PG&E's position is even stronger than that of the New York Telephone Company in the *Schwartz* case. The "Acquisition Ordinance," on which PG&E sought to express its views, was not merely a matter of general interest to PG&E, but was expressly intended to result in the taking over of PG&E's facilities within the City of Berkeley. It is also evident that as a result of PG&E's many years of experience as the owner and operator of Berkeley's electric system, that company was uniquely qualified to make an informed and valuable public comment upon the wisdom of the proposed ordinance. Under these circumstances, the conclusion is inescapable that PG&E's First Amendment rights would be abridged if defendants were permitted to prohibit such comment under section 605 of the Berkeley Election Reform Act of 1974. It follows that the trial court was correct in enjoining such threatened enforcement of section 605.[6]

The appeal from the order granting plaintiff a preliminary injunction is dismissed. The judgment granting plaintiff a permanent injunction is affirmed.

Taylor, P. J., and Kane, J., concurred.

[6]In view of this holding, we need not consider whether the trial court was also correct in determining that the enforcement of section 605 against plaintiff would deprive it of equal protection of the laws.