295 S.E.2d 805

**ANDERSON'S PAVING,
INC., et al., etc.**

v.

**Ralph E. HAYES, P. A.,
Greenbrier County.**

No. CC927.

Supreme Court of Appeals of
West Virginia.

May 12, 1982.

Dissenting June 23, 1982.

Concurring Sept. 16, 1982.

McGraw, J., dissented and filed opinion.

Miller, C. J., concurred specially and filed opinion in which McHugh, J., joined.

Jackson, Kelly, Holt & O'Farrell, Thomas E. Potter, M. Blane Michael and James R. Snyder, Charleston, for plaintiffs.

Chauncey H. Browning, Atty. Gen. and Marianne K. Hoover, Asst. Atty. Gen., Charleston, for defendant.

A. J. Manchin by Timothy N. Barber, Charleston, W. Va. Education Ass'n by Jacqueline A. Kinnaman and Robert E. Wise, Jr., Charleston, for intervenors.

The W. Va. Chamber of Commerce by Love, Wise, Robinson & Woodroe, Charles R. McElwee and William C. Porth, Charleston, for amicus curiae.

NEELY, Justice:

In the certified case before us we are asked to do nothing more than apply the

law, as formulated clearly and unambiguously by the United States Supreme Court, to the facts of this case.

## I
### *This Case*

On 11 April 1981 the West Virginia Legislature adopted Senate Joint Resolution No. 2, which proposes an amendment to the *West Virginia Constitution* designated as the "Roads for Jobs and Progress Amendment" (Road Bond Amendment). This amendment will be submitted to the electorate for ratification at a special election to be held on Tuesday, 3 November 1981.

On 3 August 1981 the plaintiffs sent a letter to the Prosecuting Attorney of Greenbrier County informing him that the plaintiff corporation planned to make contributions in support of the passage of the Road Bond Amendment. In the letter the plaintiffs asked whether they would be prosecuted under *W.Va.Code,* 3–8–8(a) and 3–9–14 [1978], which make it a criminal offense for any corporation, officer or agent acting on behalf of a corporation to make political contributions for the purposes of influencing any election issue.[1] The plaintiffs informed the prosecutor that the United States Supreme Court decision in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) made the West Virginia statutes in question unconstitutional.

On 20 August 1981 the prosecuting attorney replied. He distinguished the statute

at issue in *Bellotti* from our own statutes and informed the plaintiffs that he would prosecute them should the corporation make any contributions. Upon receipt of this reply, plaintiffs filed an action for declaratory judgment in the Circuit Court of Greenbrier County seeking to have the two statutes in question declared unconstitutional. The State moved to dismiss and the pure legal issue of constitutionality was joined. After due consideration of the defendant's motion and the U. S. Supreme Court's decision in *Bellotti,* the circuit court held the two statutes unconstitutional. The circuit court then certified the question of the constitutionality of the statutes to this Court.

## II
### *The Bellotti Case*

In *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) the United States Supreme Court struck down as unconstitutional a Massachusetts statute making it unlawful for a corporation to contribute funds or other valuable assistance to campaigns for or against any election issue or candidate. In that case the appellants, which were several national banking associations and business corporations, sought to contribute funds to publicize their opposition to a referendum to permit enactment of a state graduated personal income tax.

The Supreme Court addressed the issue by examining whether the First Amend-

---

1. *Code,* 3–8–8(a) [1978] says:
"No officer of any corporation, or agent or person on behalf of such corporation, whether incorporated under the laws of this or any other state, or foreign country, shall pay, give or lend, or authorize to be paid, given or lent, any money or other thing of value belonging to such corporation, to any candidate, financial agent or political committee or other person, for the payment of any primary or other election expenses whatever. No person shall solicit or receive such payment, contribution or other thing from any corporation, officer or agent thereof, or other person acting on behalf of such corporation."
*W.Va.Code,* 3–9–14 [1978] says:
"Except as provided in section eight [3–8–8], article eight of this chapter, any corporation

which shall, by its officers, agents or otherwise, offer, give or use, or cause to be offered, given or used, or place or cause to be placed in the possession, under the control or at the disposal of another, to be offered, given or used, directly or indirectly, money or other thing of value, for the purpose of influencing any voter or voters to vote for a particular candidate, or in any particular manner, or upon any particular side of any question to be decided at any such election, or to influence the result of any such election, it shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than five thousand nor more than twenty thousand dollars for every such offense, at the discretion of the jury."

ment protected the sort of speech which the appellants wanted to make. Finding the political subject matter of the proffered speech to be "at the heart of the First Amendment's protection," the Court next determined that the corporate nature of the speaker did not deprive the speech of its constitutional protection. 435 U.S. at 776–84, 98 S.Ct. at 1415–1420. The Court then made short work of the State's arguments in defense of the statute. Having determined that the statute entailed state-imposed restrictions on constitutionally protected speech, the Court examined the State's justifications for the statute with "exacting scrutiny." It found that there were no facts to justify the State's concern that corporate contributions would harm the electoral process. In turn the Court found that the statute's alleged protection of minority shareholders was both overinclusive and underinclusive and that the State's argument was, therefore, unconvincing. *Id.* at 786–95, 98 S.Ct. at 1421–1426.

### III

#### *Applying II to I*

The State would have us distinguish the *Bellotti* case from the case under consideration on the grounds that *W. Va. Code,* 3–8–8(b)(1)(C) [1978] permits the use of corporate facilities for the purpose of soliciting voluntary contributions from stockholders and employees which may then be expended from a separate fund for political purposes. While this does provide a tenuous basis for distinguishing the two cases, the Court concludes that the United States Supreme Court squarely held that a state may not limit a corporation's right to communicate its views on public issues. *See also Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

The difficulty of achieving a majority consensus in this controversial area of political balance and free speech undoubtedly had its effect upon the majority opinion in *Bellotti.* We find it difficult to follow the logic of the Supreme Court's opinion which distinguishes between election issues and

support of candidates. Nevertheless the facts of the case and the Supreme Court's holding are both abundantly clear. It is important, however, to recognize that the Supreme Court distinguished between corporate speech which relates to public issues and corporate speech which relates to the election of individual candidates for office, so that our opinion today in no way disturbs our State statute on this latter subject. A majority of this Court (but not this writer) disagree with the conclusions concerning corporate speech enunciated in *Bellotti*; however, the obligation of this Court is to follow the law as articulated by the United States Supreme Court.

Consequently, the Court finds that to the extent that *W. Va. Code,* 3–8–8 [1978] and *W. Va. Code,* 3–9–14 [1978] prohibit the expenditure of corporate money on direct corporate speech for the purpose of influencing the vote on a referendum issue at a public election, they are unconstitutional. In all other regards we find those statutory provisions constitutional and, rather than strike the provisions in their entirety, apply our doctrine of the least intrusive remedy to prohibit only their enforcement against corporations engaging in direct corporate speech on a public issue. As this Court said in syl. pt. 2 of *Weaver v. Shaffer,* 170 W.Va. 107, 290 S.E.2d 244 (1980):

> Where a statute serves an urgent and necessary public purpose but is technically deficient for constitutional reasons, this Court will apply the doctrine of the least intrusive remedy and give the statute, wherever possible, an interpretation which will cure its defect and save it from total invalidation.

*See also State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977). Again we emphasize that our holding in no way affects the law with regard to contributions to political candidates or direct corporate speech in support of, or in opposition to, political candidates running in public elections.

After oral argument on 29 September 1981, we handed down a decision in favor of the plaintiffs on 15 October 1981. On 12 November 1981, after the Road Bond Amendment had been defeated at the polls, we granted the West Virginia Education

Association and A. James Manchin, as Secretary of State of West Virginia, the right to intervene. On 15 December 1981 we granted a rehearing to the original and intervening parties so that we could consider any issues that were either not raised or not fully developed due to the necessary speed with which this case was originally heard. This case was reargued before us on 5 May 1982. We now conclude that the original decision interpreted and applied the law correctly.

Accordingly for the reasons set forth above this Court confirms the lower court's ruling on the constitutionality of the statutes in question as those statutes relate to direct corporate speech addressed to referendum issues but we decline to invalidate the statutes as they relate to other areas of corporate participation in elections.

Ruling affirmed.

McGRAW, Justice, dissenting:

The analysis of the constitutionality of W.Va.Code §§ 3-8-8(a) and 3-9-14 [1978] should not begin and end with an unquestioning application of *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). In *Bellotti*, the United States Supreme Court, under the guise of extending First Amendment freedom of expression to corporations, has in reality given constitutional sanctioning to the potential abuses of referendum elections sought to be avoided by approximately 31 state legislatures and Congress, where statutes similar to the ones here in question have been adopted, and has equated corporate speech with the right to freedom of expression accorded natural persons. The error committed by the United States Supreme Court that has been adopted with no analysis by a majority of this Court, is a failure to recognize the artificial nature of corporations.

In West Virginia, the creation of corporations is provided for in Article 11, § 1 (1872) of the West Virginia Constitution, which states that the "legislature shall provide for the organization of all corporations hereafter to be created." The Legislature carried out this constitutional mandate by enacting chapter 31 of the West Virginia Code, which enumerates in detail the procedures for creating and operating corporations, as well as outlining the rights, duties and liabilities of corporate entities.

It has been long established in this State, and in this country, that corporations are "artificial person, possessing those rights and properties only, which their charter confers on them either expressly or as necessarily incidental to their existence and to the carrying out of the purposes, for which they are created." *Laurel Fork & Sand Hill Railroad Co. v. West Virginia Transportation Co.*, 25 W.Va. 324, 333 (1884); *see also Trustees of Dartmouth College v. Woodward*, 17 U.S. (Wheat.) 518, 4 L.Ed. 629 (1819). Implicit in this statement is the idea that, as artificial persons, corporations are not entitled to the same constitutional rights as natural persons, but rather are entitled only to those constitutional rights that are "necessarily incidental" to the purposes of the corporation. If the denial of certain rights would materially affect a corporation, then those rights are necessarily incidental to that corporation's existence.

The United States Supreme Court, in cases prior to *Bellotti*, delineated what rights are necessarily incidental to the purposes of the corporation and those rights that are not. In *Bank of the United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 3 L.Ed. 38 (1809), the Court held that a corporation has the right to be a party in federal courts. In *Rex Trailer Co. v. United States*, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956), the Court indicated, without expressly so holding, that a corporation cannot be placed in double jeopardy in violation of the Fifth Amendment. In *Santa Clara Co. v. South Pacific Railroad*, 118 U.S. 394, 6 S.Ct. 1132, 30 L.Ed. 118 (1886), the Court held, albeit with no explanation or analysis, that a corporation is a "person" entitled to the equal protection of the laws as guaranteed by the Fourteenth Amendment. In these three cases the United States Supreme Court upheld corporate rights found to be necessarily incidental to a corporation's existence, although

the rationale for the holdings in these cases is not clearly stated in any of the opinions.

More recent decisions can also be justified by application of the rationale that certain rights are necessarily incidental to a corporation's existence. The right to commercial speech has been granted some First Amendment protection, beginning with *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Commercial speech is necessarily incidental to a corporation's existence because through its exercise the corporation is better able to inform the general public of its products and services, the end result being that more products and services will be sold, which strengthens the corporation. The right to freedom of the press has been extended to newspaper and other corporations in the field of communication. *Grosjean v. American Press Co.*, 297 U.S. 233, 55 S.Ct. 444, 80 L.Ed. 660 (1936). Since businesses in the field of communication exist to express and transmit ideas and facts through the various media, it is essential that these businesses have the right to freedom of the press. Groups or corporations organized to advance beliefs and ideas are protected by the First Amendment. *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The right to associate together for a common purpose is the whole reason for being for groups like the NAACP, therefore freedom to associate is necessarily incidental to such organizations. All three corporations or organizations in these cases would have been materially affected if the court had not extended constitutional protection to them.

The United States Supreme Court, in recognition of the artificial nature of corporations, has denied many constitutional rights to corporations. A corporation cannot claim a privilege against self-incrimination. *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). A corporation does not have an equal right to privacy as that enjoyed by a natural person. *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). A corporation is not a "citizen" within the meaning of the Privileges and Immunities clause of the Fourteenth Amendment. *Hauge v. C.I.D.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). The "liberty" protected under the Due Process clause of the Fourteenth Amendment is the liberty of natural persons, not corporations. *Northwestern Nat. Life Ins. Co. v. Riggs*, 203 U.S. 243, 27 S.Ct. 126, 51 L.Ed. 168 (1906).

The United States Supreme Court in *Bellotti*, and the majority in this case, have ignored a long line of cases where the distinction between artificial and natural persons was recognized and used as a starting point in determining what rights should be extended to corporate entities. By disregarding the artificial nature of corporations, we now have the anomalous situation where an artificial entity that is incapable of casting a ballot, can, by spending thousands of dollars, potentially dictate the outcome of a ballot referendum that may involve an issue that has no relevance to the existence of the corporation. *Bellotti* did not increase freedom of expression, but merely magnified the volume of expression allowed to artificial entities. The end result will most likely be that natural persons, who can vote and speak, will have difficulty in being heard over the blare financed by corporate money.

In the present case, the Court should have determined whether or not Anderson's Paving, Inc. would be materially affected by the passage of the Road Bond Amendment. Only if the corporation is materially affected should the Court hold that freedom of expression in this instance is necessarily incidental to Anderson's to achieve its purpose, and extend constitutional protection to allow such expression.

Therefore, I would remand for proceedings resulting in a finding of whether or not Anderson's would be materially affected by the referendum issue.

MILLER, Chief Justice, concurring:

While I concur in the result reached by the majority, I wish to emphasize that neither the majority opinion nor *First National Bank of Boston v. Bellotti*, 435 U.S.

765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), can be taken to mean that the State has no power to regulate corporate spending on referendum issues.

It should be noted that *Bellotti* was a 5–4 opinion with three of the dissenting Justices taking the view that the First Amendment rights of speech and association should be extended to a corporation only to the extent that the referendum issue has a material effect on its business activity.[1] Under this limited grant of corporate First Amendment rights, the petitioner in the case at bar would have standing to challenge our corporate election spending statutes, since the successful passage of the proposed road bond would enhance the petitioner's highway paving business.

The majority in *Bellotti* appears to recognize that a state may restrict corporate spending in a referendum where it can be shown that corporate participation has been a significant influence in the referendum or that because of prior corporate participation there has been some threat to the confidence of the citizens in their government:[2]

"But there has been no showing that the relative voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts, or that there has been any threat to the confidence of the citizenry in government. Cf. *Wood v. Georgia*, 370 U.S. 375, 388, 82 S.Ct. 1364, 1372, 8 L.Ed.2d 569, 579 (1962). 435 U.S. at 789–90, 98 S.Ct. at 1423, 55 L.Ed.2d at 726." (Footnote omitted)

Pending the rehearing in this case, the United States Supreme Court decided *Citi-*

zens Against Rent Control v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), in which it invalidated a municipal ordinance which imposed a $250 limit on contributions made to committees formed to support or oppose referenda. This opinion was virtually unanimous with only Justice White dissenting. Again the Court recognized that a state's right to control contributions to referendum issues might be authorized if there was a record that demonstrated that such control "is needed to preserve voters' confidence in the ballot measure process." 454 U.S. at 299, 102 S.Ct. at 439, 70 L.Ed.2d at 501. The Court, also, made a distinction between the state's right to limit contributions or expenditures to political candidates and contributions to ballot or referendum issues:

"Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees there is no significant state or public interest in curtailing debate and discussion of a ballot measure. Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression. The integrity of the political system will be adequately protected if contributions are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions." 454 U.S. at 299, 102 S.Ct. at 439, 70 L.Ed.2d at 501.

With the foregoing limitations in mind, I agree with the majority that W.Va.Code, 3-8-8, is overly broad to the extent that it prohibits corporations from making any contributions toward referendum issues.[3]

---

**1.** Justice Rehnquist dissented on the basis that the First Amendment has only limited applicability to the States under the Due Process Clause of the Fourteenth Amendment, and the Fourteenth Amendment applies to persons and not corporations. Therefore, in his view, a state has a right to enact legislation controlling the First Amendment rights of corporations.

**2.** Because of the absolute prohibition in W.Va. Code, 3-9-14, (see Note 3, *infra*), against any corporate contribution on referendum issues, it is not necessary to consider the distinction be-

tween contributions and expenditures drawn in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Neither is it necessary to consider contributions to political action committees. *See California Medical Association v. Federal Election Commission*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981).

**3.** While it might be possible to read W.Va.Code, 3-8-8, as applying only to corporate contributions to political campaigns, it seems clear that the prohibition in W.Va.Code, 3-9-14, against corporate contributions "for the purpose of in-

I am authorized to state that Justice McHugh joins me in this concurring opinion.

fluencing any voter or voters ... upon any particular side of any question to be decided at any such election" is clearly a prohibition against contributions in referendum elections.