FILED
United States Court of Appeals
Tenth Circuit

June 8, 2011

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

IN RE: MOTOR FUEL
TEMPERATURE SALES
PRACTICES LITIGATION.

Nos. 10-3086 & 10-3101

**ORDER**

Before **KELLY** and **MURPHY**, Circuit Judges[*].

These matters are before the court to correct a clerical error. On May 24, 2011, the

court entered its decision and judgment in these cases. Due to a clerical error, however,

the opinion was not filed with its intended concurrence. The Clerk is directed to re-file

the opinion, *nunc pro tunc* to the original filing date, with the concurrence included. A

---

[*] The Honorable Deanell Reece Tacha sat on this panel originally and participated
in the court's decision. On May 31, 2011, however, she retired and resigned her
commission. The two remaining members of the panel, who are in agreement, directed
entry of this order.

copy of the opinion with the concurrence is attached to and incorporated in this order.

Entered for the Court,

ELISABETH A. SHUMAKER
Clerk of Court

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 24, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| IN RE:  MOTOR FUEL TEMPERATURE SALES PRACTICES LITIGATION. | Nos. 10-3086, 10-3101 |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 07-MD-01840-KHV-JPO)**

---

Tristan L. Duncan (Manuel Lopez, Kevin R. Corlew, and Sarah Lynn Baltzell, Shook, Hardy & Bacon, L.L.P., Kansas City, Missouri, Alphonse Alfano and Robert Bassman, Bassman, Mitchell & Alfano Chartered, Washington, D.C., Joseph M. Weiler, Alderson, Alderson, Weiler, Conklin, Burghart, & Crow, LLC, Topeka, Kansas, Rusty Rinehart, Rinehart Law Offices, Campbell, California, John F. O'Connor, Steptoe & Johnson, LLP, Washington, D.C., with counsel on the briefs), Shook, Hardy & Bacon, L.L.P., Kansas City, Missouri, for Appellants.

Elizabeth G. Taylor (Robert A. Horn and Joseph A. Kronawitter, Horn Aylward & Bandy, LLC, Kansas City, Missouri, with counsel on the briefs), Zuckerman Spaeder LLP, Washington, D.C., for appellees.

---

Before **KELLY** and **MURPHY**, Circuit Judges, and **TACHA**, Senior Circuit Judge.

---

**TACHA**, Senior Circuit Judge.

---

The appellants, who include the defendant motor fuel retailers ("defendants" or "retailers") and non-party, retail motor fuel trade associations ("non-party trade associations" or "trade associations") to which the retailers belong, seek reversal of the district court's discovery order directing them to disclose information that they claim is privileged under the First Amendment. To achieve this end, the appellants filed both an interlocutory appeal and a petition for a writ of mandamus in this court. We DISMISS the interlocutory appeal for lack of appellate jurisdiction, and we DENY the mandamus petition.

## I. BACKGROUND

The plaintiffs filed twelve putative class actions in seven federal district courts against the defendant retailers. The plaintiffs seek damages and injunctive relief based on the retailers' maintenance of a volumetric pricing system for retail motor fuel that does not account for expansion of the fuel's volume due to temperature increases. The plaintiffs allege that when the temperature of motor fuel increases, its volume expands but its energy content remains the same. Furthermore, the plaintiffs contend that pricing mechanisms for motor fuel sales account for temperature variations at all levels of the distribution chain except at the retail level. Accordingly, the plaintiffs charge the retailers with conspiring to defraud American consumers by purchasing motor fuel at wholesale under a pricing system that compensates for temperature variations, and then selling that fuel, after its volume has expanded and without disclosing that fact, to consumers

according to a pricing system that does not account for temperature variations. In response to the plaintiffs' consolidated complaint, the retailers alleged, among other things, that it would be illegal, impractical, and impossible to account for temperature variations in retail motor fuel sales.

In 2007, the Judicial Panel on Multidistrict Litigation consolidated and transferred the plaintiffs' lawsuits to the District of Kansas for discovery and other pre-trial proceedings. The plaintiffs then served interrogatories and document requests on the retailers, seeking information relating to their communications with retail motor fuel trade associations, weights and measures organizations, government agencies, and each other regarding automatic temperature compensation ("ATC").[**] The retailers opposed these discovery requests on the grounds that disclosure of such information would infringe on the their First Amendment rights to freely associate in order to pursue political, social, and economic ends and to petition the government. The plaintiffs then filed a motion to compel.

Shortly thereafter, the plaintiffs served subpoenas on the non-party retail motor fuel trade associations seeking information relating to their communications with the retailers, government entities, and other trade associations regarding the implementation of ATC in the United States. A

---

[**]ATC generally refers to technology that enables retail fuel pumps automatically to adjust the price of the fuel based on the fuel's temperature.

number of the retailers, who are members of these non-party trade associations, filed a motion to quash the subpoenas. The retailers argued, among other things, that the disclosure of such information would infringe on the retailers' and the trade associations' First Amendment associational rights. The non-party trade associations filed motions stating that they joined in the retailers' motion to quash, but they did not formally seek to intervene in the lawsuit.

In subsequent briefing on both the motion to compel and the motion to quash, as well as during a hearing before the magistrate judge, the retailers argued for a "presumed privilege" not to disclose internal and inter-group communications regarding ATC, which the retailers characterized as strategic lobbying materials. In the alternative, the retailers argued that (1) they could demonstrate a reasonable probability that disclosure of that information would chill their First Amendment associational rights sufficient to establish a prima facie claim of privilege; and (2) the plaintiffs had not met their resultant burden to demonstrate a compelling need for the information that outweighed the retailers' and trade associations' interests in keeping the information private.

Holly Alfano, vice president of government affairs for the National Association of Truckstop Operators ("NATSO"),[1] provided an unsworn statement to the court in support of the retailers' privilege claim. Ms. Alfano gave her opinion regarding the temporal and economic costs of complying with the

---

[1]NATSO is one of the non-party trade associations served with a subpoena.

- 4 -

discovery requests; stated that she believed it would be unfair for NATSO to have to disclose its past research, strategy, and deliberative processes regarding ATC to its opponents in the ATC debate; and described what she thought the effects of a disclosure order would be. In relevant part, she stated:

> You know, why should they [the plaintiffs] have everything we've done, all of our internal research, all of our private conversations with our members trying to understand this issue, you know, because they think maybe there's something there, you know, that's not, it's nonexistent. . . .
>
> So I just—I think it's very unfair for us to turn over all of our work and all of our strategy on this issue which is ongoing.
>
> . . .
>
> So if I have to plan my . . . testimony at [weights and measures] hearings, because they're open hearings, where they get people—they invite interested parties to come up and speak, I'm very reluctant to call any of my members and ask them questions knowing that it's information that I have to provide to my adversaries. . . .
>
> I just don't think I would be able to do it and I won't be able to effectively represent the interests of my members. So that's a huge burden. And I kind of feel like this is an effort really to shut down our . . . lobbying efforts. . . .
>
> You know, we have a right to gather those facts and present them in the best way we can. We're going to have a hard time doing that if . . . every time I want to call a member . . . I'd have to say . . . if you tell me anything and I make a note of it, I've got to disclose it. I don't think I'm going to get a lot of help from them. So that's our big problem with this.

The retailers did not otherwise produce evidence to support their claim of privilege.

The magistrate determined that many of the communications at issue were

privileged under the First Amendment and that the plaintiffs had not met their burden to overcome the privilege.[2] *See generally In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 407 (D. Kan. 2009). On both the plaintiffs' and the defendants' motion for review, however, the district court found entirely in favor of the plaintiffs. *See In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145 (D. Kan. 2010). In doing so, the district court concluded that none of the requested information was entitled to a presumption of privilege under the First Amendment and that the retailers must instead make a prima facie showing that the privilege applies. *See id.* at 1155, 1158–59, 1163–64. The court went on to hold that the retailers failed to meet that burden because they had not presented evidence sufficient to demonstrate a reasonable probability that disclosure of any of the information would chill their associational rights.[3] *Id.* at 1160, 1164.

The retailers then filed a motion to reconsider, arguing primarily that: (1)

---

[2]It is unclear whether the magistrate applied a presumption of privilege to any or all of the requested information. In addition, we note that the magistrate determined that the First Amendment did not apply to information shared among the trade associations. Because the district court issued its own opinion without adopting the magistrate's analysis, however, it is not necessary at this point to relate in detail the magistrate's memorandum and order.

[3]In the alternative, the district court held that even if the retailers had met their burden with respect to the discovery requests seeking internal trade association communications, the plaintiffs demonstrated a need for the information that outweighed the retailers' First Amendment interests in non-disclosure. *In re Motor Fuel Temperature*, 707 F. Supp. 2d at 1163.

the requested information is presumptively privileged; (2) to the extent a presumption is inapplicable, the retailers satisfied their burden to make a prima facie showing that disclosure of the information would arguably chill their associational rights; and (3) the retailers should be permitted to supplement the record with additional evidence of a chilling effect. The retailers also moved for an emergency stay of the district court's order. The district court denied both the motion to reconsider and the motion for an emergency stay, reiterating its holding that the retailers had failed to meet their prima facie burden and declining the retailers' request to supplement the record. *In re Motor Fuel Temperature*, 707 F. Supp. 2d at 1166–69.

The retailers and the non-party trade associations then filed an interlocutory appeal, a petition for a writ of mandamus, and a request for an emergency stay of the district court's order in this court. The plaintiffs seek dismissal of the interlocutory appeal for lack of appellate jurisdiction, and they oppose the mandamus petition and the request for an emergency stay. We consolidated the interlocutory appeal and the mandamus petition and temporarily stayed the district court's order pending our resolution of those matters.

## II. DISCUSSION

A.    The First Amendment Privilege: Right of Association[4]

---

[4]We note that, at times, the appellants appear to frame the right at issue as one involving the right to petition the government. The essence of the appellants' briefing below and to this court, however, is that disclosure of the information would chill their right of association.

Before reaching the interlocutory appeal and mandamus petition, we begin by setting forth the contours of the First Amendment privilege and how it is implicated in the case before us. The Supreme Court has long "acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295 (1981). Indeed, the right of association guaranteed by the First Amendment is premised in part on the notion that some ideas will only be expressed through collective efforts. *See id.* at 294 ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost."). Moreover, because some collective efforts to express ideas will only be undertaken if they can be undertaken in private, *see NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."), the Supreme Court has recognized a privilege, grounded in the First Amendment right of association, not to disclose certain associational information when disclosure may impede future collective expression. *Id.* ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may

Moreover, the appellants fail to make any clear argument distinguishing the right to petition the government and the right of association that would permit us to analyze their claims as derivative of the right to petition the government. Accordingly, this opinion refers only to the appellants' right of association.

- 8 -

constitute a[n] effective [] restraint on freedom of association.").  In other words, the First Amendment privilege generally guarantees the right to maintain private associations when, without that privacy, there is a chance that there may be no association and, consequently, no expression of the ideas that association helps to foster.

The seminal case addressing the First Amendment privilege is the Supreme Court's decision in *NAACP v. Alabama*.  There, the state of Alabama brought suit in state court to enjoin the NAACP from doing any business in the state based on its alleged noncompliance with the state's foreign corporation qualification statute.  *Id.* at 451.  To support its claim that the NAACP was conducting intrastate business in Alabama, the state moved for—and the state court ordered—the production of the NAACP's membership lists.  *Id.* at 453–54.  The NAACP did not comply with the order and was held in contempt.  *Id.* at 454.  The United States Supreme Court reversed the contempt judgment.  *Id.* at 467.  The Court first acknowledged that the "compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective [] restraint on freedom of association" because of "the vital relationship between freedom to associate and privacy in one's associations."  *Id.* at 462.  The Court then recognized that the NAACP had made "an uncontroverted showing that on past occasions revelation of the identity of its rank-and file members [] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other

manifestations of public hostility." *Id.* Accordingly, the Court concluded that, under the circumstances, compelled disclosure would "chill" or "affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate" by "induc[ing] members to withdraw . . . and dissuading others from joining [] because of fear of exposure of their beliefs shown through their associations and of the consequences of exposure." *Id.* at 462–63. The Court did not find a compelling state interest which would justify the intrusion on the right. *Id.* at 466; *see also Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539–43 (1963) (Florida state legislature's investigation into criminal activity and communism; the legislature sought by subpoena to obtain the entire membership list of the Miami branch of the NAACP, which the records custodian disobeyed and was then held in contempt and sentenced to imprisonment by state court).

The Supreme Court has not limited the First Amendment privilege to membership lists. In *DeGregory v. Atty. Gen. of New Hampshire*, 383 U.S. 825 (1966), for example, the Supreme Court considered the right of a private individual to refuse to answer questions from New Hampshire's attorney general regarding the individual's affiliation with communist groups. In that case, the attorney general was investigating—pursuant to his authority under a state statute—the individual's interest in the overthrow of the United States or in other subversive acts. *See Maynard v. DeGregory*, 209 A.2d 712, 713–14 (N.H. 1965).

The individual refused to answer the questions and was held in contempt in state court. *See id.* at 714–15. The Supreme Court reversed. *See* 383 U.S. at 830. It reasoned that governmental exposure of unpopular political views and associations is objectionable and damaging, and that it is indefensible under the First Amendment absent an overriding and compelling state interest, which had not been demonstrated in the circumstances. *See id.* at 829–30.

The Supreme Court similarly faced an assertion of First Amendment associational rights in *Buckley v. Valeo*, 424 U.S. 1 (1976). Candidates for federal office and political groups challenged provisions of the Federal Election Campaign Act of 1974 and portions of the Internal Revenue Code which established caps and reporting requirements on federal campaign contributions. 424 U.S. at 6–7. The Court recognized that the caps and reporting requirements impinged on the freedom of association under the First Amendment and went on to consider whether the federal government had an appropriately compelling justification for imposing the laws. *See id.* at 24–25, 35–36, 44–45, 57–58, 64–65. Other cases raising the constitutionality of statutes in light of the First Amendment associational right include *NAACP v. Button,* 371 U.S. 415, 434–38 (1963) (Virginia law criminalizing the act of giving advice to a person that his rights may have been violated and referring him to an attorney for help); *Shelton v. Tucker*, 364 U.S. 479, 480–84 (1960) (Arkansas law requiring public school teachers to submit affidavits listing the names of all organizations to which they

belonged as a prerequisite to employment); and *Bates v. City of Little Rock*, 361

U.S. 516, 518 (1960) (city ordinance requiring any organization to supply its

membership and contributor list to the city upon request and requiring that the

lists be made public).

Although the First Amendment privilege has now been applied by various

courts in varying contexts, no court has directly considered its application to a

case like ours, where a court compels disclosure of trade groups' and their

members' strategic pre-lobbying communications in a lawsuit between private

parties. In *NAACP v. Alabama*, however, the Court made it clear that the First

Amendment privilege applies "whether the beliefs sought to be advanced by

association pertain to political, *economic*, religious, or cultural matters." 357

U.S. at 461 (emphasis added). Moreover, in *Grandbouche v. Clancy*, we

expressly held that the First Amendment privilege applies to discovery orders

issued in litigation involving only private parties. 852 F.2d 1463, 1466 (10th Cir.

1987).[5]  Thus, we conclude that the First Amendment privilege applies to the

---

[5]The Ninth Circuit faced a similar situation in *Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009). Two same-sex couples filed suit challenging the constitutionality of California's Proposition 8, which provided that the state would only recognize marriage between a man and a woman. *Perry*, 591 F.3d at 1131. The state attorney general refused to defend in the suit. *Id.* at 1132. The court then permitted the official proponents of Proposition 8 and the official Proposition 8 campaign committee, all of whom were private parties, to intervene as defendants. *Id.* The plaintiffs served discovery requests on the defendant-proponents seeking their campaign communications, but the defendant-proponents objected on First Amendment grounds. *Id.* The Ninth Circuit held that the defendant-proponents were entitled to assert a First Amendment privilege and that the plaintiffs had to demonstrate a sufficiently justifiable interest in the

district court's discovery order, which requires trade groups and their members to disclose to a private party their communications regarding strategy for lobbying against the implementation of ATC in the United States. Accordingly, we turn now to the substance of the interlocutory appeal and mandamus petition.

B.    Jurisdiction Over the Interlocutory Appeal

"Congress has the constitutional authority to define the jurisdiction of the lower federal courts, and, once the lines are drawn, limits upon federal jurisdiction must be neither disregarded nor evaded." *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (internal citations, quotations, and alterations omitted). Generally, Congress has afforded the courts of appeals jurisdiction to review only "final decisions of the district courts." 28 U.S.C. § 1291. "A decision is 'final' when it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *S.E.C. v. Merrill Scott & Assocs., Ltd.*, 600 F.3d 1262, 1270 (10th Cir. 2010) (quotations omitted).

"Implicit in § 1291 is Congress' judgment that the *district judge* has the primary responsibility to police the prejudgment tactics of litigants, and that the district judge can better exercise that responsibility if the appellate courts do not repeatedly intervene to second-guess prejudgment rulings." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985). The final judgment rule also alleviates the substantial burden that would be imposed on the courts of appeals by the

_____

information that would outweigh the privilege. *See id.* at 1139–41.

"fragmentary and piecemeal review of the district court's myriad rulings in the course of a typical case." *Boughton v. Cotter Corp.*, 10 F.3d 746, 748 (10th Cir. 1993). Moreover, deferring appellate review until the district court has finally resolved a case promotes efficient judicial administration by "reduc[ing] the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals." *Flanagan v. United States*, 465 U.S. 259, 264 (1984). With these interests in mind, we have long held that "[d]iscovery orders entered during the course of litigation ordinarily are not 'final' under [§ 1291]." *Merrill Scott & Assocs., Ltd.*, 600 F.3d at 1270; *see also Boughton*, 10 F.3d at 748.

The appellants contend that notwithstanding our general prohibition against interlocutory appeals of discovery orders, we may exercise jurisdiction over their interlocutory appeal pursuant to: (1) the collateral order/*Cohen* doctrine, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949); (2) the *Perlman* doctrine, *see Perlman v. United States*, 247 U.S. 7 (1918); and (3) the pragmatic finality doctrine.

1. *The Collateral Order/*Cohen *Doctrine*

"[I]n *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), the Supreme Court long ago held that, as a 'practical' matter, some interlocutory orders can qualify as 'final decisions' within the meaning of § 1291 because, while they don't conclusively resolve the litigation, they do conclusively resolve

- 14 -

important questions separate from the merits." *United States v. Wampler*, 624 F.3d 1330, 1334 (10th Cir. 2010). This practical construction of the final judgment rule, which has come to be known as the collateral order or *Cohen* doctrine, permits interlocutory review of district court orders which "(1) finally decide (2) an important question collateral to (or separate from) the merits of the underlying proceeding, and (3) [are] 'effectively unreviewable' after final judgment." *Id.* "This circuit has repeatedly held that discovery orders are not [generally] appealable under the *Cohen* doctrine." *Boughton*, 10 F.3d at 749.

Without addressing the first two *Cohen* requirements, we conclude that discovery orders adverse to a claimed First Amendment privilege are not immediately appealable under the *Cohen* doctrine because they are effectively reviewable after final judgment and by other means. *See Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 869 (1994) ("[T]he failure to meet the third condition of the *Cohen* test . . . would in itself suffice to foreclose immediate appeal under § 1291."). When analyzing the third *Cohen* requirement, we do not consider whether the circumstances of the particular case before us warrant our immediate review; rather, we examine whether the entire category of rulings to which the claim belongs can be adequately vindicated on review of a final judgment or by other means. *See Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009). "The crucial question . . . is whether deferring review until final judgment so imperils [a substantial public interest] as to justify the cost of

allowing immediate appeal of the entire class of relevant orders." *Id*. at 606.

Preservation of the right to associate privately in order to pursue common objectives is undoubtedly a substantial public interest. The appellants argue that immediate appeals of discovery orders adverse to a claimed First Amendment privilege justify the resultant costs because once private information is disclosed, "the violation of privacy . . . cannot be undone." Moreover, the appellants contend that deferring review of such orders until final judgment will deter association and dampen full and frank communication within associations.[6] We do not agree that these potential harms justify the costs of allowing immediate collateral order review of all discovery orders adverse to a claimed First Amendment privilege.

While we readily acknowledge that no perfect remedy can be obtained once a party discloses information which it has a right and a desire to keep private, the absence of a perfect remedy does not justify a less-than-strict adherence to the final judgment rule. *Mohawk*, 130 S. Ct. at 605 ("That a ruling may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment . . . has never sufficed."). Indeed, in *Mohawk*, the

---

[6]We are not unsympathetic to the appellants' additional arguments that the possibility of a settlement or defense verdict at trial, in addition to the fact that the privilege has been asserted in multidistrict litigation, further justifies review. We are reminded, however, that the availability of an interlocutory appeal under *Cohen* turns not on the facts of any specific case but rather to the class of claims as a whole. *See Mohawk*, 130 S. Ct. at 605.

Supreme Court rejected an argument which is nearly identical to the one appellants now propound. There, a corporation sought immediate review of a discovery order adverse to its claimed attorney-client privilege,[7] arguing that the privilege "provides a 'right not to disclose privileged information in the first place,'" *id.* at 607, and that "the right to maintain attorney-client confidences . . . is 'irreparably destroyed absent immediate appeal' of adverse privilege rulings." *Id.* at 606. The Supreme Court disagreed, stating that "[a]ppellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 606–07.

Moreover, as was the case in *Mohawk*, there are several additional alternatives to collateral order review of a discovery order that may adequately remedy alleged violations of the First Amendment privilege. First, the district court may certify an interlocutory appeal under 28 U.S.C. § 1292(b). *See id.* at 607. Second, parties claiming a privilege may, as the appellants in this case have, seek a writ of mandamus. *Id.* Third, parties claiming a privilege may defy the

---

[7]The fact that the privilege at issue here is derived from the First Amendment rather than common law does not render *Mohawk* unpersuasive. *Cf. United States v. Wampler*, 624 F.3d 1330, 1340 (10th Cir. 2010) (holding that criminal defendants could not immediately appeal the denial of their motion to dismiss an indictment on First Amendment grounds because "First Amendment defenses like those asserted here are adequately safeguarded by review after any adverse final judgment.") (quotations omitted); *see also Perry*, 591 F.3d at 1135 ("The constitutional nature of the right is not dispositive of the collateral order inquiry.") .

discovery order, incur court-imposed sanctions, and appeal from the sanctions. *See id.* at 607–08. The availability of these alternatives counsels strongly against permitting immediate collateral order review of all discovery orders adverse to a claimed First Amendment privilege. *See id.* at 609 ("We expect that the combination of standard postjudgment appeals, § 1292(b) appeals, mandamus, and contempt appeals will continue to provide adequate protection to litigants ordered to disclose materials purportedly subject to [a] privilege. Any further avenue for immediate appeal of such rulings should be furnished, if at all, through rulemaking, with the opportunity for full airing it provides.").

Finally, we are not persuaded by the appellants' suggestion that the inability immediately to appeal discovery orders adverse to a claimed First Amendment privilege will discourage individuals and businesses from associating to pursue common purposes and stifle full and frank communications among members of associations. Indeed, we are skeptical that the availability of an immediate appeal is a primary concern for an individual or business who is considering associating with others to achieve a common purpose or considering discussing a matter of importance with a fellow member of an association. And we seriously doubt that such individuals or businesses will actually refrain from associating or choose not to communicate with others in their associations simply because they will not be permitted to immediately appeal a discovery order which requires them to disclose allegedly privileged information. *Cf. Mohawk*, 130 S.

Ct. at 607 ("[D]eferring review until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel. . . . [because] in deciding how freely to speak, clients and counsel are unlikely to focus on the remote prospect of an erroneous disclosure order, let alone on the timing of a possible appeal.").

For these reasons, we conclude that discovery orders adverse to a claimed First Amendment privilege are not immediately appealable under the collateral order/*Cohen* doctrine.[8]

2.    *The* Perlman *Doctrine*

Citing *Perlman v. United States*, 247 U.S. 7, 13 (1918), the non-party trade associations seek to appeal the portion of the district court's order compelling the retailers to disclose documents.  Specifically, the non-party trade associations contend that some of the retailers have indicated a willingness to disclose information in which the trade associations claim a privilege, and that the trade associations will be powerless to protect their privileges if they are not permitted an immediate appeal.

In *Perlman*, the inventor of a device, Louis Perlman, testified on behalf of his company in an infringement suit against Firestone Tire & Rubber Company.

---

[8]We also point out that we have not previously permitted immediate appeals of discovery orders adverse to a claimed First Amendment privilege under the *Cohen* doctrine, and we repeat our recent admonition that "any request for expansion of the *Cohen* doctrine should be directed to the [judiciary's] rules committee, not this court." *Wampler*, 624 F.3d at 1338.

247 U.S. at 8.  As part of his testimony, Mr. Perlman submitted exhibits to the court.  *Id.*  Mr. Perlman's company ultimately sought to dismiss its suit without prejudice, and the court granted the motion conditioned on the exhibits being impounded in the custody of the court clerk.  *Id.* at 8–9.  Thereafter, the United States initiated a grand jury proceeding against Mr. Perlman and sought the exhibits from the court clerk in support of the criminal investigation.  *Id.* at 9–10.  Mr. Perlman objected, but the court ordered the clerk to produce them.  *Id.* at 10–11.  On Mr. Perlman's appeal to the Supreme Court, the United States argued that the order was interlocutory and unreviewable.  *Id.* at 12.  The Supreme Court disagreed, stating simply:

> The second contention of the government is somewhat strange, that is, that the order granted upon its solicitation was not final as to Perlman but interlocutory in a proceeding not yet brought and depending upon it to be brought.  In other words, that Perlman was powerless to avert the mischief of the order but must accept its incidence and seek a remedy at some other time and in some other way.  We are unable to concur.

*Id.* at 13.

In the nearly one hundred years since *Perlman*, this court has applied the so-called *Perlman* doctrine to permit, in some circumstances, the subject of a criminal grand jury proceeding to appeal an order of the district court compelling a witness to provide allegedly privileged testimony or produce allegedly privileged documents in the grand jury proceeding, despite the fact that the subject of the proceeding is not the party to whom the order is directed.  *See, e.g.*,

- 20 -

*In re Grand Jury Proceedings*, 616 F.3d 1172, 1179 (10th Cir. 2010); *In re Grand Jury Proceedings*, 156 F.3d 1038, 1040 (10th Cir. 1998); *In re Grand Jury Proceedings*, 144 F.3d 653, 657–58 (10th Cir. 1998); *In re Grand Jury Proceedings*, 857 F.2d 710, 711–12 (10th Cir. 1988); *In re Grand Jury Proceedings*, 723 F.2d 1461, 1464–66 (10th Cir. 1983). Because the subject of the grand jury investigation will have no other opportunity to contest the order (once the witness provides his testimony, an indictment may issue and the defendant irretrievably loses the privilege he maintains in the testimony), we have reasoned that *Perlman* provides for an immediate appeal based on the impossibility of any other review. *See, e.g.*, *In re Grand Jury Proceedings*, 723 F.3d at 1465; *see also United States v. Nixon*, 418 U.S. 683, 691 (1974) (the *Perlman* doctrine applies only in a "limited class of cases where denial of immediate review would render *impossible* any review whatsoever of an individual's claims") (emphasis added); *Cobbledick v. United States*, 309 U.S. 323, 328 (1940) ("To have denied him opportunity for review on the theory that the district court's order was interlocutory would have made the doctrine of finality a means of denying Perlman *any* appellate review of his constitutional claim.").

We are aware of no case, however, and the non-party trade associations do not cite any, that extends *Perlman* beyond criminal grand jury proceedings. We decline to do so here. The underpinnings of the *Perlman* rule—the impossibility

- 21 -

of an appeal later on—simply do not apply with equal force to a subpoena directed at a non-party as part of discovery in civil litigation. *See In re Grand Jury Proceedings*, 616 F.3d at 1179 ("One to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey."). And in any event, the non-party trade associations in this case have not shown how they are precluded from any further review. Although the trade associations claim a First Amendment privilege in information which the district court has ordered the retailers to disclose and which some retailers have indicated a willingness to disclose, the trade associations readily acknowledge that the discovery order directed to the retailers and subpoenas currently directed at themselves[9] "raise the same First Amendment issues." *See* Def.'s Pet. for Writ of Mandamus at 21 n.7. Thus, it is possible for the trade associations to obtain review of their First Amendment claims without obtaining an immediate appeal of the portions of the discovery order which were directed at the retailers. Namely, they may refuse to comply with the subpoenas directed to themselves, incur contempt citations, and appeal from the contempt orders. Accordingly, they may not invoke *Perlman* as a

---

[9]The magistrate quashed as unduly burdensome the original subpoenas directed at the trade associations, but the plaintiffs have since served the associations with revised subpoenas. Enforcement of the revised subpoenas has been stayed, along with all other discovery, pending this appeal.

basis for appellate jurisdiction.

### 3.	*The Pragmatic Finality Doctrine*

Unlike the collateral order/*Cohen* and *Perlman* doctrines, which have been fairly well defined by a significant body of precedent, the pragmatic finality doctrine is malleable, its applicability depending on the circumstances of any given case.  Indeed, under the pragmatic finality doctrine, "a practical construction of § 1291 may generate jurisdiction through a subjective and ad hoc balancing of the interests of the parties against the policies of an unambiguous finality rule."  *Stubblefield v. Windsor Capital Grp.*, 74 F.3d 990, 996 (10th Cir. 1996) (quotations omitted).  The doctrine has been the subject of "increasing criticism," 15A Charles A. Wright, et al., Fed. Prac. & Proc. Juris. § 3913 (2d ed.), and we have questioned its continued viability for the last fifteen years, *see Stubblefield*, 74 F.3d at 996 ("[I]t is unclear whether the [pragmatic finality] doctrine is still viable.").  We continue to question its viability after *Mohawk*. We need not decide that precise issue, however, because the order at issue clearly does not fall within bounds of the pragmatic finality doctrine.

We have applied the doctrine "only in unique or exceptional circumstances."  *Id*. (quotations omitted).  "'The critical inquiry is whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review.'"  *Id*. (quoting *Bender v. Clark*, 744 F.2d 1424, 1427 (10th Cir. 1984)).  In denying the appellants' appeal under the collateral

order/*Cohen* doctrine, we held that, categorically, the danger of injustice by delaying appellate review of discovery orders adverse to a claimed First Amendment privilege does not outweigh the inconvenience and costs of piecemeal review of all such orders. The appellants point out, however, that in addition to the injustices that are inherent in delaying all discovery orders adverse to a First Amendment privilege, because this is an MDL case, the respective actions will be transferred to multiple district courts within various circuit courts throughout the country for trial. Thus, the appellants argue, if they are forced to wait until after trial to rectify their First Amendment privilege claims, they will receive a patchwork of potentially inconsistent rulings affecting their important constitutional rights.

We do not find this sufficient to deviate from the plain construction of § 1291. In *Mohawk*, the Supreme Court cautioned that we are to give "full respect" to the Rules Enabling Act, which, in part, "designat[es] rulemaking, '*not expansion by court decision*' as the preferred means for determining whether and when prejudgment orders should be immediately appealable." *Mohawk*, 130 S. Ct. at 609 (emphasis added) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 48 (1995)). In light of this admonition and out of deference to Congress' authority to define our appellate jurisdiction, we decline to permit an immediate appeal in this case based on our own subjective balancing of the interests involved.

4.    *Summary*

We lack jurisdiction to review appellants' interlocutory appeal under the collateral order/*Cohen* doctrine, the *Perlman* doctrine, and the pragmatic finality doctrine.  Accordingly, we dismiss the interlocutory appeal for lack of appellate jurisdiction.

C.    Mandamus

Mandamus is not the same as, nor is it a substitute for, a direct appeal.  *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir. 2009).  Rather, it is "a drastic remedy, [which] is to be invoked only in extraordinary circumstances." *Id*.  When a petitioner seeks a writ of mandamus to reverse a discovery order adverse to a claimed privilege, we first analyze whether: "(1) disclosure of the allegedly privileged or confidential information renders impossible any meaningful appellate review of the claim of privilege or confidentiality; and (2) the disclosure involves questions of substantial importance to the administration of justice."  *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 654–55 (10th Cir. 1984); *see also In re Cooper Tire*, 568 F.3d at 1187 n.5.  Given the circumstances of this case, we conclude that the disclosure satisfies these initial prerequisites.[10]

We therefore turn to the particulars of the district court's order.  In contrast to a direct appeal of a discovery order, which is reviewed only for an abuse of

_____

[10]Our conclusion is based on the unique posture of this particular case.  We do not hold, as a blanket rule, that claims of a First Amendment privilege will always satisfy this two-pronged test.

- 25 -

discretion, *see Trentadue v. FBI*, 572 F.3d 794, 806 (10th Cir. 2009), a party

seeking a writ of mandamus "must have no other adequate means to attain the

relief he desires," and "must demonstrate that his right to the writ is clear and

indisputable." *In re Cooper Tire*, 568 F.3d at 1187. In addition, "[we], in

exercise of [our] discretion, must be satisfied that the writ is appropriate under

the circumstances." *Id.* Thus, "[a]lthough a simple showing of error may suffice

to obtain reversal on direct appeal, a greater showing must be made to obtain a

writ of mandamus." *Id.* at 1186. Indeed, "[t]here must be more than what we

would typically consider to be an abuse of discretion in order for the writ to

issue." *Id.*

>1.    *The Appellants' Claims*

>>a.    The District Court's Refusal to Consider the Information
>>"Presumptively Privileged" Under the First Amendment

In support of their mandamus petition, the appellants first argue that the

district court erred in failing to presume that the information sought by the

plaintiffs is privileged under the First Amendment. According to the appellants,

disclosure of the information—which the appellants claim reflects "core

associational activity"—should be deemed presumptively privileged, with the

initial burden on the party seeking the information to demonstrate a compelling

need for it which outweighs the appellants' interest in keeping it private.

Contrary to the appellants' position, however, we have generally held that the party claiming a privilege always bears the initial burden of establishing the factual predicate for the privilege. *See, e.g.*, *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984) ("A party seeking to assert a privilege must make a clear showing that it applies."). We are not persuaded that this traditional allocation of burdens should be dispensed with simply because the claimed privilege implicates the First Amendment and the appellants' right of association. Indeed, the weight of existing authority instructs that the party claiming a First Amendment privilege in an objection to a discovery request bears the burden to make a prima facie showing of the privilege's applicability. *See In re First Nat'l Bank, Englewood, Colo.*, 701 F.2d 115, 118 (10th Cir. 1983) ("[W]hen a party makes 'a prima facie showing of arguable First Amendment infringement . . . the burden then [shifts] to the government to make the appropriate showing of need for the material.'") (quoting *United States v. Citizens State Bank*, 612 F.2d 1091, 1094 (8th Cir. 1980)); *Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989) ("In each of the [controlling] cases the party withholding information from a court or public agency made a prima facie showing that disclosure would infringe its First Amendment rights . . . . [such as demonstrating] that disclosure of members' identities exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.") (quotations omitted); *Perry*, 591 F.3d at 1140

("In this circuit, a claim of First Amendment privilege is subject to a two-part framework. The party asserting the privilege must [first] demonstrate a prima facie showing of arguable first amendment infringement."). Under these cases, the burden shifts to the party seeking discovery only after the party claiming the privilege makes this prima facie showing. *See NAACP*, 357 U.S. at 463; *Terry*, 886 F.2d at 1355 ("A party resisting discovery need not make a showing of harm or other coercion; but before the burden shifts . . . [the party] must at least articulate some resulting encroachment on their liberties."); *Perry*, 591 F.3d at 1140 ("If appellants can make the necessary *prima facie* showing, the evidentiary burden will then shift to the [party seeking discovery]."). Accordingly, we cannot say that the district court committed any error in refusing to presume that the information at issue is privileged under the First Amendment, let alone that the court committed the egregious error necessary for us to issue a writ of mandamus.[11]

---

[11]In doing so, we also reject the appellants' related contention that the magistrate's protection of the trade associations' membership and financial contributor lists, in conjunction with the district court's refusal to presume a privilege for communications among trade associations, suggests that the courts below "valu[e] speaker identity more than political speech itself" and categorically deem those communications among trade associations unworthy of First Amendment protection, all in violation of *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010). To begin, the plaintiffs have never challenged the protection afforded to the membership and financial contributor lists, so any alleged inconsistency between that ruling and the district court's order is simply not before us. More importantly, however, *Citizens United* has no bearing on the issues involved in this interlocutory appeal and petition for mandamus. The district court never purported to shield trade associations' members' speech based on the members' identity as individuals and deny protection to the trade associations due to their organizational

b.      The District Court's Application of the Prima Facie Burden

Having refused to presume a First Amendment privilege, the district court required that the appellants "through objective and articulable facts make an evidentiary showing of a reasonable probability of chill on an association right." *In re Motor Fuel Temperature*, 707 F. Supp. 2d at 1159 (quotations omitted); *see also id.* at 1164. The district court held that the appellants could meet this burden by demonstrating "that disclosure will deter membership due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities or economic interests." *Id*. at 1160; *see also id.* at 1164. According to the district court, however, the appellants failed to make this showing. *See id*. at 1160, 1164.

The appellants claim that even if the information at issue is not presumptively privileged, they are entitled to a writ of mandamus because the district court imposed too stringent a prima facie burden on them. Specifically,

status. Indeed, the plaintiffs never presented such an argument to either the magistrate or the district court in opposition to the appellants' discovery objections. And the district court clearly held that "[*o*]*n the facts of this case*, defendants have not shown an objectively reasonable probability that disclosure of lobbying and legislative communications between trade associations regarding ATC for retail motor fuel would chill their First Amendment rights." *In re Motor Fuel Temperature*, 707 F. Supp. 2d at 1164 (emphasis added). This analysis demonstrates: (1) the district court's application of the First Amendment analysis to communications among trade associations; and (2) the appellants' failure to satisfy their prima facie burden as to those communications. Thus, we disagree with the appellants that "[t]he District Court . . . abused its discretion in holding that the presumption only applies to protect speaker identity, *i.e.*, membership and contributor lists, not political speech itself" and that the court "discriminate[d] against groups like [the] trade associations by placing extra burdens on them."

appellants contend that the district court "too narrowly limit[ed] the type of consequences that suggest a chill on First Amendment rights," and that it "overstat[ed] the [prima facie] burden."

With respect to the appellants' contention that the district court too narrowly construed the type of potential chilling effects which can satisfy the prima facie burden, the appellants argue that they adequately showed the following consequences of disclosure, which objectively suggest a probable chill on their First Amendment rights: (1) the plaintiffs will gain an unfair advantage in the policy debate over the implementation of ATC in retail motor fuel sales in the United States; and (2) complying with the plaintiffs' discovery requests will cost several hundred thousand dollars and therefore interfere with the trade associations' internal operations.

As discussed earlier in this opinion, the First Amendment privilege at issue in this case generally ensures privacy in association when exposure of that association will make it less likely that association will occur in the future, or when exposure will make it more difficult for members of an association to foster their beliefs. These are the "chilling effects," or consequences of disclosure, that the First Amendment privilege seeks to avoid. But the appellants in this case fail to explain how their main contention on this point—that the information sought as part of this litigation will give the plaintiffs an unfair advantage in the policy debate over the implementation of ATC—will hinder their associational rights

(e.g., lobbying efforts, ability to communicate among themselves regarding legislative policy, or maintenance of members within the trade associations). Instead, the appellants appear simply to argue that a chill can be "inferred" in this case without describing how the disclosure of information would degrade their ability to associate.[12]  Furthermore, the appellants do not cite any case which supports their assertion that "mak[ing] . . . political opponents privy to . . . internal strategies" is "alone" sufficient to demonstrate a chilling effect on their First Amendment rights.[13]

Likewise, we reject the appellants' contention that they sufficiently demonstrated a chilling effect by showing that they will have to devote time and money to comply with the discovery requests.  To begin, this argument seems better suited to a burdensome, not a First Amendment, challenge.  To the extent that the appellants suggest that the cost of compliance decreases the amount of available lobbying funds, we do not agree that this is sufficient to establish a prima facie case of chill on the right of association.   As the district court pointed out, no court has construed the First Amendment privilege so broadly.  Indeed, taken to its logical extreme, this argument would render all discovery prima facie

[12]Moreover, and contrary to the appellants' suggestion, one might equally infer that the appellants' incentive to associate might be *heightened* by such disclosure.

[13]Although *Perry* recognizes that the compelled disclosure of campaign communications *can* deter activities protected under the First Amendment, the campaign committee in that case also presented evidence in support of their assertion of a chill on future campaign communications. *See Perry*, 591 F.3d at 1163.  Moreover, the dispute before us does not involve campaign communications regarding a public referendum.

privileged under the First Amendment because any time or money spent complying with a discovery request could conceivably be spent petitioning the government or engaging in other activities which are protected under the First Amendment.

Finally, we disagree that the appellants have demonstrated the requisite entitlement to mandamus based on the evidence of a chill that they did, in fact, present to the district court. Unlike their assertions related to a competitive disadvantage and the cost of compliance, the appellants purported to present evidence that disclosure of the requested information would discourage membership in the trade associations and stifle full and frank discussions within and among the trade associations—a type of chill which, if properly supported by evidence, would satisfy the appellants' prima facie burden. The "evidence" presented, however, was minimal and equivocal, consisting only of the following unsworn statement of Ms. Alfano:

> You know, why should they [the plaintiffs] have everything we've done, all of our internal research, all of our private conversations with our members trying to understand this issue, you know, because they think maybe there's something there, you know, that's not, it's nonexistent. . . .
>
> So I just—I think it's very unfair for us to turn over all of our work and all of our strategy on this issue which is ongoing.
>
> . . .
>
> So if I have to plan my . . . testimony at [weights and measures] hearings, because they're open hearings, where they get people—they invite interested parties to come up and speak, I'm very reluctant to call any of

my members and ask them questions knowing that it's information that I have to provide to my adversaries. . . .

I just don't think I would be able to do it and I won't be able to effectively represent the interests of my members. So that's a huge burden. And I kind of feel like this is an effort really to shut down our . . . lobbying efforts. . . .

You know, we have a right to gather those facts and present them in the best way we can. We're going to have a hard time doing that if . . . every time I want to call a member . . . I'd have to say . . . if you tell me anything and I make a note of it, I've got to disclose it. I don't think I'm going to get a lot of help from them. So that's our big problem with this.

Although we have not articulated the precise quantum of proof necessary to establish a prima facie case of privilege under the First Amendment, we also have not held that one single unsworn statement is sufficient. Rather, we have held that a party claiming a First Amendment chilling affect meets its burden by submitting, for example, affidavits which "describe harassment and intimidation of [a group's] known members, and the resulting reluctance of people sympathetic to the goals of [the group] to associate with [it] for fear of reprisals." *In re First Nat'l Bank*, 701 F.2d at 116–17. Furthermore, other courts, including the Supreme Court, have held that the prima facie burden is satisfied by similar proof of a chilling effect. *See NAACP*, 357 U.S. at 462 ("Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."); *see also Perry*, 591 F.3d at 1143 (quoting one of multiple

- 33 -

declarations from group's members that "I can unequivocally state that if the personal, non-public communications I have had regarding this ballot initiative . . . are ordered to be disclosed through discovery in this matter . . . I will be less willing to engage in such communications . . . [and] I . . . would have to seriously consider whether to even become an official proponent again."); *see also Terry*, 886 F.2d at 1355 ("Absent a more specific explanation of the consequences of compliance with discovery, [such as alleging that access to documents would discourage potential members from joining the organization for fear of government retaliation], defendants failed to make the required initial showing of potential First Amendment infringement.").

To be clear, we do not purport, in this opinion, to create a bright-line rule delineating the minimum proof necessary to satisfy the prima facie burden. Nevertheless, we cannot say that the district court clearly and egregiously erred in concluding that Ms. Alfano's single statement was insufficient. The appellants presented significantly less evidence of a chilling effect than what has been deemed sufficient in prior cases. They presented only one witness who presented only an unsworn statement. The substance of the statement is ambiguous, appearing to reflect Ms. Alfano's sense of unfairness in having to share her association's work as much as her concern that any court-ordered disclosure in this case will actually prevent the associations from gathering facts for their lobbying efforts. Indeed, her statement appears to mischaracterize the extent of

the disclosure to which the appellants might be subject and which, accordingly, would be the cause of their "chill": Ms. Alfano suggests that she will now, as a matter of course and apparently for an indefinite timeframe, have to automatically turn over any "note" she makes after a discussion with a NATSO member, and she comments on the impact that would have on NATSO's fact-finding and lobbying efforts. We, however, do not understand the issue to be so broad; instead, the issue is whether a trade association or one of its members will refrain from communicating regarding lobbying efforts based on their fear that in the future, a litigant might seek discovery relating to those communications and a court might order the disclosure of them. Ms. Alfano's statement does not touch on that issue.

Accordingly, the appellants have not demonstrated a "clear and indisputable right" to a writ of mandamus, *see In re Cooper Tire*, 568 F.3d at 1187, based on the district court's holding that they had not satisfied their burden to establish a prima facie case of First Amendment chill. *See id.* ("It is not appropriate to issue a writ when the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction.").[14]

---

[14]Because we uphold the district court's determination that the appellants failed to satisfy their prima facie burden, we need not address the appellants' claim that the district court incorrectly applied the second prong of the First Amendment privilege inquiry—that is, whether the party seeking the information has a sufficiently compelling need for the information that outweighs the other party's interest in keeping it private. As discussed above, the court only reaches the second prong of the First Amendment privilege inquiry if the party claiming the privilege satisfies its prima facie burden.

c.     Appellants' Request to Supplement the Record

Having concluded that the district court did not err in applying the prima facie burden, we easily decline to issue a writ of mandamus ordering the district court to permit appellants to supplement the record with further evidence of a chilling effect.  The appellants devoted the majority of their briefing and argument below to their contention that a First Amendment privilege should be presumed.  As discussed above, however, the weight of authority regarding the First Amendment privilege has always required the party asserting the privilege to initially demonstrate a reasonable probability that disclosure will chill its associational rights.  The appellants are not entitled to a second opportunity to establish their privilege simply because they made the unwise strategic decision to seek a presumption rather than meet their evidentiary burden.  The time for the appellants to support their privilege claim with evidence has passed.

**III.  CONCLUSION**

We DISMISS the appellants' interlocutory appeal for lack of appellate jurisdiction, and we DENY the appellants' mandamus petition.  Additionally, we lift the stay of the district court's discovery order which we issued on April 30, 2010.

- 36 -

Nos. 10-3086, and 10-3101, *In re: Motor Fuel Temperature Sales Practices Litigation.*

**KELLY**, Circuit Judge, concurring.


I agree with the court that to trigger the First Amendment privilege, a party must "through objective and articulable facts make an evidentiary showing of a reasonable probability of chill on an association right." Ct. Op. at 29 (quotation marks and citations omitted). I write separately to emphasize that the burden for establishing this prima facie showing is not difficult when supported by available evidence.

In the context of compelled disclosure of internal associational communications, courts have concluded that a party can meet this burden by submitting: an affidavit asserting that disclosure would "drastically alter" how the affiant communicates in the future and would cause the affiant to be "less willing to engage in such communications," Perry v. Schwarzenegger, 591 F.3d 1147, 1163 (9th Cir. 2010); an affidavit indicating that compelled disclosure would frustrate the group's decisions as how to organize itself, conduct its affairs, select its leaders, and effectively select its message and the best means to promote that message, AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168, 177 (D.C. Cir. 2003); and a letter from a member stating that he or she would no longer attend meetings if communications are disclosed, Dole v. Serv. Emps. Union, AFL-CIO, Local 280, 950 F.2d 1456, 1460 (9th Cir. 1991).

Appellants have obtained declarations which similarly assert a reasonable probability of chill on core First Amendment associational rights. One such declaration states, "I likely would have chosen not to speak or become involved in the political process had I known that my internal communications could be disclosed to the opponents in the public policy debate." Aplt. App. at 1687. Another declares that "If I had known that my communications . . . could be subject to disclosure through discovery . . . I would not have solicited or disseminated information to members as I did so freely here." Id. at 1711.

Had these declarations been timely (and no persuasive reason suggests that they could not have been submitted earlier), this would be a different case, and it would next be necessary to engage in an ad hoc balancing.